ADOLPH COORS COMPANY et
al., Appellants,

v.

OKLAHOMA ALCOHOLIC BEVERAGE
CONTROL BOARD, Appellee.

No. 50704.

Supreme Court of Oklahoma.

Sept. 19, 1978.

Bradley, Campbell & Carney, Leo N. Bradley, Golden, Colo., Fellers, Snider, Blankenship & Bailey, Oklahoma City, for appellant, Adolph Coors Co.

J. M. Sheehan, James E. Britton, McClelland, Collins, Sheehan, Bailey & Bailey, Oklahoma City, for appellant, Pabst Brewing Co.

McAfee, Taft, Mark, Bond, Rucks & Woodruff by Philip D. Hart, Oklahoma City, for appellant, Jos. Schlitz Brewing Co.

Andrews, Mosburg, Davis, Elam, Legg & Bixler, Theodore M. Elam, Jack L. Kinzie, Oklahoma City, for appellant, Miller Brewing Co.

Ames, Daugherty, Black, Ashabranner, Rogers & Fowler by Phil E. Daugherty, Oklahoma City, for appellant-intervenors, United States Brewers Association, Carling National Breweries, Inc., Pearl Brewing Co.

Larry Derryberry, Atty. Gen. of Okl., Kenneth Delashaw, Asst. Atty. Gen., for appellee.

LAVENDER, Vice Chief Justice:

A licensed Class B wholesaler under Oklahoma Alcoholic Beverage Control Act, 37 O.S.1971, § 501 et seq., Lee Distributing Co. (Lee), attempted to order strong beer from Adolph Coors Company (Coors). Lee had no distributor's contract with Coors. That brewer requested a declaratory ruling of the Oklahoma Alcoholic Beverage Control Board (Board) establishing a board policy under 37 O.S.1971, § 533.[2]

At Board hearing, Coors and one of its contract distributors, Ford Distributing Company, made a showing of the need for quality control, through refrigeration and inventory rotation, of Coors beer due to its brewing process so as to prevent deterioration and reduction in quality. Refrigeration of wholesale warehouse and either refrigeration or insulation of delivery trucks necessitate substantial investment and expenditure for cooling energy. Distributors are required to adhere to this quality control and also to follow Coors policies contained in a brochure of over some fifty pages covering, but not limited to, such items as marketing, advertising, management policies, and personnel policies. Coors maintained a position that sales to any licensed Class B wholesaler required by § 533 be subject to the same controls as its contract distributors.

Board entered its declaratory ruling under date of July 27, 1976. That ruling required Coors to sell to all licensed Class B wholesalers without contractual requirements made with its distributors, except as to quality controls of refrigeration and inventory rotation as specified in the ruling. Coors sought judicial review in the district court as allowed in the Administrative Procedure Act, 75 O.S.1971, § 318. By subsequent rule amendment, the Board made the provisions of the declaratory ruling applicable to all brewers. Other affected brewers intervened in the district court review. That court affirmed the declaratory ruling of the Board. Brewers appeal.

---

2. Section 533 reads, in part:
"Any manufacturer or subsidiary of a manufacturer who markets his or its products solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker, brewer, or importer of alcoholic beverages, bottled or made in a foreign country, either within or without this State, shall be required to sell such brands or kinds of alcoholic beverages to every licensed wholesaler or Class B wholesaler who desires to purchase the same, on the same price basis and without discrimination or inducements, and shall further be required to sell such beverages only to those persons licensed as wholesalers or Class B wholesalers. * * *"

Brewers argue the ruling (1) improperly interprets § 533 in requiring sales to any licensed Class B wholesaler; (2) requires a prohibited extra-territorial effect of § 533; (3) interferes with the right to contract; (4) discriminates against present contract distributors; and (5) violates due process. Board contends its declaratory ruling is a policy determination required by the correct interpretation of § 533, and within the state's power to control the liquor industry.

■ As a part of Oklahoma Alcoholic Beverage Control Act, § 533 must be viewed in the same policy determination as the entire act. In *State v. Parham*, Okl., 412 P.2d 142 (1966) this court, by syllabus, said:

"The policy of law expressed by the Legislature in the Oklahoma Alcoholic Beverage Control Act is that, within the framework of strict regulation, the commercial aspects of the liquor industry of this State shall be operated under the conditions of free and unrestricted competition."

Strict regulation comes from the general police powers, but strengthened by the broad sweep of the Twenty-First Amendment of the U. S. Constitution. *Okl. Alcoholic, etc. v. Heublein Wines, Intern.*, Okl., 566 P.2d 1158 (1977).

■ Applying the policy of free and unrestricted competition to language of § 533, "shall be required to sell * * * to every licensed wholesaler or Class B wholesaler, who desires to purchase the same," necessitates the affirming of the declaratory ruling of the Board as to required sales to any Class B wholesaler seeking to purchase the strong beer manufactured by a brewer subject to regulation by the Oklahoma Act.

■ Brewers say the f. o. b. sale, outside Oklahoma, gives a prohibited extra-territorial effect to § 533. There must be achieved a balance between the lawful goal of regulation of the liquor industry and the degree to which commerce outside the state is encumbered. The mere fact the state regulatory action has repercussion beyond state lines does not by itself mean the ac-

tion is an unconstitutional burden on interstate commerce. *Okl. Alcoholic, etc., supra.* Otherwise, as argued by the Board, the control act could be defeated in part through f. o. b. sales outside the state.

■ We are not persuaded by the brewers' "due process" arguments that Board's action unlawfully violates contract rights created between themselves and their distributors, or constitutes wrongful discrimination against their contract distributors. The police power is an exercise of the sovereign right of the government to protect the general welfare of the people, and is paramount to any rights under contracts between individuals. *East New York Sav. Bank v. Hahn*, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945). Though that power acting on contracts is not without limitations, we find this discussion in the recent decision of *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

"The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements. This principle is summarized in Mr. Justice Holmes' well-known dictum: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.' *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).

"Yet private contracts are not subject to unlimited modification under the police power. The Court in *Blaisdell [Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413] recognized that laws intended to regulate existing contractual relationships must serve a legitimate public purpose. 290 U.S., at 444–445, 54 S.Ct. at 242. A State could not 'adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce

them.' *Id.*, at 439, 54 S.Ct. at 240. *Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption. Id., at 445–447, 54 S.Ct. at 242–43. As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. East New York Savings Bank v. Hahn, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945).*" (Emphasis added; footnotes deleted.)

We hold § 533, and the Board's declaratory ruling under that section to be an exercise of this state's broad power to regulate the liquor industry and need not be concerned that private contract will be impaired or even destroyed. Here, that regulatory power serves a legitimate public purpose and upon reasonable conditions as demonstrated in allowing quality controls. This is a socio-legal regulation with this court deferring to the legislative judgment as to its necessity.

Affirmed.

HODGES, C. J., and WILLIAMS, IRWIN, BARNES, SIMMS and DOOLIN, JJ., concur.